# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LOUISIANA PELLETS, INC., et al.[1] | ) | Case No. 16-80162 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

### _EXPEDITED_ MOTION FOR ENTRY OF ORDERS (I) APPROVING BIDDING PROCEDURES AND POTENTIALLY AWARDING CERTAIN PROTECTIONS AND (II) AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Louisiana Pellets, Inc. ("LPI") and German Pellets Louisiana, LLC ("GPLA"), the debtors and debtors-in-possession in the above-captioned cases (together, the "Debtors"), hereby file, pursuant to sections 105(a), 363, and 365 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" or "FRBP"), this _Motion for Entry of Orders: (I) Approving Bidding Procedures and Potentially Awarding Certain Protections and (II) Authorizing (A) the Sale of Substantially All of the Debtors' Assets, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases_ (the "Motion"). In support of this Motion, the Debtors state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Louisiana Pellets, Inc. (3369) and German Pellets Louisiana, LLC (3414). The location of the Debtors' corporate headquarters and service address is: 4915 Highway 125, Urania, Louisiana 71480.

1

NO:0104253/00008:187893v1

16-80162
LA Pellets
Inc. et al

**EXHIBIT**
DD# **1**
4-4-17

## I.    PRELIMINARY STATEMENT

1.    As the Court is aware, the Debtors have been engaged in a marketing process to maximize the value of the Debtors' business and assets for the benefit of the estates and the creditors. After considering the available options, and after a thorough marketing process, the Debtors now move this Court to approve the bidding and sale procedures set forth below.

2.    The Motion seeks the entry of two orders relating to the proposed sale (the "Sale") of some, all or substantially all of the Debtors' property associated with their facility, which consists of a solid-waste disposal and wood biomass pellet manufacturing facility located in Urania, Louisiana (the "Facility").

3.    First, this Motion seeks an order (the "Bidding Procedures Order") approving bidding procedures in the form attached as **Exhibit 1** hereto (the "Bidding Procedures"). The Bidding Procedures include an auction process, in which bidders will be invited to participate and submit bids for the sale of the Debtors' business and assets. Exercising their business judgment and considering their options in light of the marketing process that has been conducted, the Debtors believe that the proposed Bidding Procedures are reasonable and necessary to maximize the value of the estates and maximize the return to the Debtors' creditors.

4.    Second, the Debtors request entry of an Order (the "Sale Order"), under Section 363 of the Bankruptcy Code, effectuating a sale "free and clear" of all claims and liabilities, in conjunction with the results of the proposed Auction.

## II.    JURISDICTION AND VENUE

5.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later

2

determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.    Venue of these cases and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

7.    The statutory predicate for the relief requested herein is Bankruptcy Code §§ 105(a), 363, and 365 and FRBP 2002, 6004, 6006 and 9014

### III.    BACKGROUND FACTS

#### A.    Introduction

8.    On February 18, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Western District of Louisiana (the "Court") commencing the above-captioned chapter 11 cases (the "Bankruptcy Cases").

9.    The Debtors have continued in possession of their properties and have continued to operate and maintain their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.    No trustee or examiner has been appointed in these chapter 11 cases. An Official Committee of Unsecured Creditors (the "UCC") was appointed on March 15, 2016. (D.I. 80).

#### B.    The Need to Sell the Facility

11.    The Debtors have determined, based on current circumstances, and in the exercise of their business judgment and in consultation with the stakeholders, that a sales process will maximize the value of the Debtors' assets and business.

12.    The final order authorizing debtor in possession financing (the "DIP Loan") and use of cash collateral (the "Final DIP Order") (D.I. 210) established certain bankruptcy

3

NO:0104253/00008:187893v1

milestones, including that the Debtors would seek to engage an investment banker to solicit offers relating to the affiliation or acquisition of the Debtors' Facility through a section 363 sale or as a plan sponsor under a plan of reorganization. The Debtors complied with this obligation by filing a motion (the "IB Motion") seeking authorization to retain Saltbox Partners LLC and Headwaters BD, LLC (collectively, the "Investment Banker") (D.I. 243), which request was approved by this Court by order dated May 25, 2016 (D.I. 324).

13.     The Final DIP Order also included the further bankruptcy milestone that the Debtors, and UMB Bank, National Association in its roles as DIP Lender and Bond Trustee (both as defined in the Final DIP Order) would agree to a marketing and sale process with specific further milestone dates following approval of the IB Motion. After various discussions and input from the Investment Banker, the parties agreed to a timeline for soliciting initial proposals relating to the Facility and the Debtors' other property. Since its retention, the Investment Banker has established a virtual on-line data room, has prepared various marketing materials (including a Confidential Information Memorandum (the "CIM")), and has solicited offers for the Facility. Through this process, numerous parties have accessed the data room, conducted physical inspections of the Facility, and provided general and initial indications of interests relating to the possible acquisition of the Facility.

14.     Reviewing the available options, and in consultation with the Bond Trustee and other stakeholders, the Debtors have elected to put forward the proposed Bidding Procedures as a means to move forward the marketing and sale process, in a manner designed to achieve the best and highest possible recovery for the estates. The Debtors believe that the Bidding Procedures (consented to by the Bond Trustee) will result in a competitive bidding and auction process, thus enhancing the recovery to the estates and the Debtors' creditors.

4

NO:0104253/00008:187893v1

15.     In consulting with the Investment Banker, creditors and other stakeholders, the Debtors have considered all restructuring and sale alternatives, and the Debtors have concluded that the proposed auction and sale process is the measure best calculated under the present circumstances to deliver the highest value to the estates and the creditors.

## IV.     PROPOSED SALE AND BIDDING PROCEDURES[2]

16.     This section summarizes the key provisions of the Bidding Procedures. The Debtors believe that it is in the best interests of their estates and their creditors to pursue the Sale under sections 105 and 363 of the Bankruptcy Code. In connection with the Sale, the Debtors believe that conducting an Auction in accordance with the Bidding Procedures among Qualified Bidders to obtain the highest or otherwise best offer will maximize the value of their estates.

### A.     Requirements to Participate in the Auction

17.     The Bidding Procedures provide that only Qualified Bidders may participate in the Auction. To be a Qualified Bidder, a party wishing to submit a proposal, offer, or bid must first become a Potential Bidder, which requires execution of a nondisclosure agreement ("NDA") in the form provided by Debtors' counsel and in form and substance satisfactory to the Debtors. Upon qualifying as a Potential Bidder, a party may receive due diligence information from the Debtors, including access to the Debtors' on-line data room, the CIM and potentially other non-public information relating to the Debtors' assets.

18.     The proposed deadline to submit bids ("Bid Deadline") is February 24, 2017.[3]

19.     The Bidding Procedures also set forth the requirements for a Potential Bidder to

---

[2] Capitalized terms used but not defined in this Motion shall have the meaning provided in the Bidding Procedures. Further, to the extent of any inconsistency between this Motion and the Bidding Procedures, the Bidding Procedures will control.

5

become a Qualified Bidder, including (without limitation) that a Potential Bidder: (i) submit a Bid by the Bid Deadline to the Bid Deadline Recipients identified in the Bidding Procedures (including the Debtors, the Bond Trustee, the Investment Banker, and the UCC); (ii) provide a clean and marked-up copy of the proposed Asset Purchase Agreement (which form shall be consistent with the Draft APA, the form of which is posted in the Debtors' on-line data room); (iii) provide a copy of the draft Sale Order marked to reflect the amendments and modifications compared to the form of Sale Order posted in the Debtors' on-line data room; (iv) pay a Deposit by wire transfer in the amount of $1,000,000 (subject to an increase to the amount of ten percent (10%) of the proposed Purchase Price following the Auction), or such other amounts acceptable to the Debtors in consultation with the UCC and the Bond Trustee; (v) demonstrate that it has the financial wherewithal and ability to consummate the Sale; and (vi) disclose any connections to the Debtors and affiliated persons  The Bidding Procedures further provide that a Bid may propose cash or non-cash consideration including without limitation cash, assumption of debt, or any combination thereof.

20.     A Bid that satisfies each of the requirements under the Bidding Procedures (including without limitation those in the foregoing paragraph), as determined by the Debtors in their reasonable discretion, in consultation with the Bond Trustee and the UCC, constitutes a Qualified Bid, and such Potential Bidder submitting such Bid will be termed a Qualified Bidder. Prior to any Auction, the Debtors shall file and serve on all Potential Bidders who submitted a Bid a notice indicating which Bids, if any, have been designated as Qualified Bids.

---

[3] The Bidding Procedures expressly permit the Debtors to extend certain dates and deadlines on the terms set forth therein.

6

NO:0104253/00008:187893v1

**B. Bond Trustee's Right to Credit Bid**

21.     The Bidding Procedures provide that the Bond Trustee may submit a credit bid at any time, including during the Auction. Such Bid shall be considered a Qualified Bid.

**C. Stalking-Horse Designation and Bidding Protections**

22.     To increase the competitive nature of the sale process, the Bidding Procedures provide that the Debtors, in their discretion, after consultation with the UCC and with the prior consent of the Bond Trustee, may designate an Opening Bid for the Auction and may agree that the Opening Bidder shall have stalking horse status and protections, including a break-up fee and expense reimbursement in an amount not to exceed in the aggregate 2% of the proposed Purchase Price under such Qualified Bidder's bid  (the "Break-Up Fee"). The Bidding Protections provide that any Break-Up Fee, to the extent payable, shall only be paid from proceeds received by the Debtors at the Closing of a Sale or the transfer of the Purchased Assets pursuant to an alternative transaction. The award of stalking horse protection may occur without further notice or order of the Court, with the exception that in the event that a Stalking Horse Bidder is designated, the Debtors shall file notice of that designation within 24 hours of such designation, and the matter will be announced at the Auction.

**D. Auction**

23.     Upon request of the Bond Trustee or if the Debtors receive more than one Qualified Bid, the Debtors will conduct an Auction at the offices of Locke Lord LLP, 600 Travis St, Suite 2800, Houston, TX 77002.

24.     The proposed Auction date is March 2, 2017.[4]

---

[4] As set forth in the Bidding Procedures, the Debtors may extend certain dates and deadlines on the terms set forth therein. It is the intent of the Debtors to hold the Auction on the first business day immediately following the auction in the *In re Texas Pellets, Inc.* bankruptcy case, pending in the

7

NO:0104253/00008:187893v1

25.    The Auction shall be governed by the following procedures:

(a) only Qualified Bidders, in person or through duly-authorized representatives at the Auction may bid at the Auction, and every Qualified Bidder must have at least one (1) such duly-authorized representative with authority to bind the Qualified Bidder at the Auction;

(b) only such authorized representatives of each of the Qualified Bidders, the Debtors, the Bond Trustee, the UCC, the holders of the Bonds and their respective advisors shall be permitted to attend the Auction;

(c) prior to the commencement of the Auction, representatives of the Debtors, and/or the Bond Trustee may have discussions with each Qualified Bidder with respect to the terms and conditions of such Qualified Bids and the Debtors will have selected a Qualified Bid in consultation with the Bond Trustee and the UCC, to become the opening bid at the Auction (the bid submitted by such Qualified Bidder shall be referred to as the "Opening Bid" and the bidder shall be referred to as the "Opening Bidder");

(d) bidding shall commence at the amount of the Opening Bid. The Opening Bid shall be announced by the Debtors at or before the commencement of the Auction;

(e) other Qualified Bidders may then submit successive bids in increments of at least $500,000 (plus, with respect to the first successive bid, the amount of the Break-Up Fee provided, if any) higher than the bid at which the Auction commenced and all further bids must be at least $500,000 higher than the previous bid. To the extent applicable, the Stalking Horse Bidder shall have the right (but not the obligation) to increase its Opening Bid (and any subsequent bids) by using, as a credit, the amount of the Break-Up Fee when determining whether the Stalking Horse Bidder has topped the previous bid by the required amount;

(f) Qualified Bidders shall have the right to submit additional bids and make additional modifications to their Qualified APA at the Auction, consistent with the Bidding Procedures, provided that any such modifications to the Qualified APA, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors than any prior bid by such party (as determined by the Debtors, following consultation with the Bond Trustee and the UCC). The Debtors, the Bond Trustee and/or the UCC reserve the right to separately negotiate the terms of any bid at the Auction, provided the terms are fully disclosed at the time such bid is formally submitted;

(g) the bidding will be transcribed by a certified court reporter employed by the Debtors to ensure an accurate recording of the bidding at the Auction;

---

United States Bankruptcy Court for the Eastern District of Texas and identified by case number 16-90126.

8

NO:0104253/00008:187893v1

(h) each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the proposed Sale and is not in violation of Section 363(n) of the Bankruptcy Code;

(i) absent irregularities in the conduct of the Auction, the Debtors will not consider any Potential Bids made after the Auction is closed; and

(j) the Auction shall be governed by such other auction procedures as may be announced by the Debtors, from time to time on the record at the Auction, in consultation with the Bond Trustee and the UCC.

**E.    Representations and Warranties**

26.    Except as explicitly set forth in the Draft APA, any Sale of the Purchased Assets will be transferred on an "as is, where is" basis, with all faults, and without representations or warranties of any kind, nature or description by the Debtors, their agents or estates, whether written, verbal, express, implied, or by operation of law.

**F.    Acceptance of the Winning Bid and Designation of the Back-Up Bid**

27.    Upon the conclusion of the Auction (if such Auction is conducted), the Debtors, in the exercise of their reasonable, good-faith business judgment and after consultation with the Bond Trustee and the UCC, shall identify: (i) the Winning Bid, which is the highest or otherwise best Qualified Bid submitted at the Auction; and (ii) the next highest or otherwise best Qualified Bid (the "Back-Up Bid" and the party submitting the Back-Up Bid, the "Back-Up Bidder"). The Winning Bidder and the Back-Up Bidder shall both be required to immediately execute a definitive Qualified Bid conformed to the provisions of the Winning Bid and the Back-Up Bid, as applicable. The definitive agreement executed by the (i) Winning Bidder is defined as the "Winning Bid APA" while the agreement executed by the (ii) Back-Up Bidder is defined as the "Back-Up Bid APA".

28.    The Back-Up Bidder must keep the Back-Up Bid open and irrevocable until the earlier of (i) 5:00 p.m. (Prevailing Central Time) on the date which is fourteen (14) days after the

9

Outside Date (as defined in the Winning Bid APA), subject to extension as necessary for transfer or assignment of any permits (the "Outside Back-Up Date") and (ii) the date of closing of the transaction with the bidder who prevails at the Auction.

29.     Within one business day after the Auction is completed, the Winning Bidder and Back-Up Bidder shall each pay to the Debtors an additional amount in cash that, when combined with the Deposit equals ten percent (10%) of the purchase price reflected in the final bid of the Winning Bidder and Back-Up Bidder (such additional amounts shall thereafter be included in the definition of the "Deposit").

30.     If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid as the winner of the Auction (conditioned upon approval by the Court) only when: (i) such bid is declared the Winning Bid; (ii) definitive documentation has been executed in respect thereof; and (iii) any additional Deposit required as a result of a bid submitted at the Auction (as required by the Bidding Procedures) has been provided to the Debtors. Such acceptance is conditioned upon approval by the Court of the Winning Bid and (if applicable) the Back-Up Bid.

## V.     ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

31.     Besides selling substantially all their physical assets, the Debtors also seek in connection with the Sale to potentially assume and assign certain of their executory contracts and unexpired leases (collectively, the "Executory Contracts") pursuant to Bankruptcy Code § 365. The Debtors are filing a separate *Motion to Approve Assumption and Assignment Procedures for Certain Executory Contracts and Unexpired Leases* (the "Executory Contract Motion") that asks this Court to approve certain procedures for, *inter alia*, notifying counterparties to the Executory Contracts of their contracts' potential assumption and

10

NO:0104253/00008:187893v1

16-80162 - #575  File 01/18/17  Enter 01/18/17 14:59:36  Main Document  Pg 10 of 30
16-80162 - #659-1  File 04/04/17  Enter 04/05/17 15:54:39  Exhibit Debtor 1 part 1 Pg 10 of 25

assignment, fixing the cure amounts necessary to assume those Executory Contracts, and addressing any potential objections to the proposed assumption and assignment of the Executory Contracts (including without limitation to the cure amounts and/or to proposed assurance of future performance). These procedures will ensure that the counterparties to the Executory Contracts, among others, receive adequate notice and an opportunity to respond to the proposed assumption and assignment of the Executory Contracts.

## VI.    THE SALE HEARING

32.    This section summarizes the process by which the Debtors will seek to procure a Sale Order from the Court approving the results of the Auction and Sale.

33.    As part of this Motion, the Debtors are asking this Court to schedule a sale hearing (the "Sale Hearing"). The Debtors will present the results of the Auction to the Court at the Sale Hearing, at which time certain findings will be sought from the Court regarding the Auction, including, among other things, that: (i) the Auction was conducted, and the Winning Bidder and the Back-Up Bidder were selected, in accordance with the Bidding Procedures; (ii) the Auction was fair in substance and procedure; (iii) each of the Winning Bid and the Back-Up Bid was a Qualified Bid; (iv) Closing of the Sale with the Winning Bid (or if applicable, the Back-Up Bid) will provide the highest or otherwise best value for the Purchased Assets and is in the best interests of the Debtors; and (v) each of the Winning Bidder and the Back-Up Bidder are deemed to be purchasers of the Purchased Assets in good faith as set forth in Section 363(m) of the Bankruptcy Code.

34.    At the Sale Hearing, the Debtors shall ask the Court to enter an order approving the Winning Bid as part of the Sale Order. Except to the extent revised by the Debtors in their discretion, after consultation with the Bond Trustee, the UCC, and the Winning Bidder, the Sale

11

Order presented to the Court at the Sale Hearing shall be in the form submitted as part of the Winning Bid.

35.     At the Sale Hearing, the Debtors will also request, as a further provision in the Sale Order, that the Court authorize the Debtors to accept the Back-Up Bid as the Winning Bid and to consummate such bid if the Winning Bid is not consummated when and as required by its terms, all without further order of the Court. The Debtors and the Back-Up Bidder shall be bound to consummate the Back-Up Bid if the Winning Bid terminates, at which time the Back-Up Bidder shall be deemed the Winning Bidder. The Debtors shall promptly give notice to the Back-Up Bidder if the Winning Bid is terminated and shall provide the Back-Up Bidder a reasonable period of time within which to close as set forth in the Back-Up Bid APA.

## VII.   RETURN OF DEPOSITS

36.     Finally, at the closing of the Sale, the Debtors propose to credit the Deposit of the Winning Bidder to the Purchase Price. If the Winning Bidder fails to close, such Deposit shall be retained by the Debtors or returned to the Winning Bidder in accordance with the Winning Bid APA.

37.     The Deposits of any Qualified Bidders other than the Winning Bidder and the Back-Up Bidder, will be returned within two (2) business days after the Sale Hearing concludes.

## VIII.   RELIEF REQUESTED

38.     By this Motion, the Debtors respectfully request entry of two orders:

(a)     The Bidding Procedures Order approving the proposed Bidding Procedures, which are attached as **Exhibit 1**, and the Auction and Sale Notice, which is attached as **Exhibit 2**, with the proposed form of such Bidding Procedures Order being attached to this Motion; and

(b)     The Sale Order, authorizing: (i) the sale of the Purchased Assets

12

NO:0104253/00008:187893v1

(including the Facility) pursuant to the Winning Bid APA, free and clear of all claims, interests, liens or encumbrances not expressly assumed, and (ii) the assumption and assignment of those Executory Contracts that the Winning Bidder seeks to have assumed and assigned to it.

## IX.    BASIS FOR THE REQUESTED RELIEF AND AUTHORITIES IN SUPPORT

39.    The Debtors believe that cause exists to grant both the Bidding Procedures Order and the Sale Order. The proposed Bidding Procedures are reasonable and necessary to effectuate the sale process and provide sufficient notice and opportunity to permit bidders to participate in the Auction. Upon conclusion of the Auction, the Debtors believe that sufficient cause will exist to enter the Sale Order approving the proposed Sale to the Winning Bidder from the Auction.

### A.    The Proposed Bidding Procedures Should Be Approved.

40.    The Debtors believe it is in the best interest of their estates, creditors, and employees to seek court authorization for a formal process for soliciting potential bidders to participate in the Auction.  The Debtors seek approval of the Bidding Procedures in order to maximize the highest and best bids for the Purchased Assets (including the Facility). The Debtors believe that the Bidding Procedures will permit interested parties reasonable opportunities, consistent with the financial constraints of the Debtors, to evaluate whether to propose a Bid for the Purchased Assets.

41.    Under Bankruptcy Rule 6004(f)(1), the Debtors may sell property outside the ordinary course of business by private sale or by public auction. In this case, the Debtors believe that an open auction process will expose the Purchased Assets to a broad and diverse market and ensure a sale or sales to the highest and best offer(s).

42.    If the Bidding Procedures are approved, the Investment Banker, on behalf of the Debtors, will continue to solicit bids for the Purchased Assets up through the Bid Deadline. The

13

NO:0104253/00008:187893v1

Bidding Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders and the Debtors, the receipt, negotiation and qualification of Bids received, the conduct of any Auction, and the selection and approval of any Winning Bidder.

**B.      The Proposed Bidding Procedures Are Reasonable and Necessary.**

43.      The Bidding Procedures were developed in consultation with the Investment Banker (and with the consent of the Bond Trustee) to be consistent with the Debtors' compelling need to expedite the sale process and promote participation and active bidding.

44.      The Debtors believe that the Auction and proposed Bidding Procedures will promote active bidding from seriously interested parties and will identify the best and highest offer for the Purchased Assets. The proposed Bidding Procedures are intended to allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Debtors believe that the Bidding Procedures are: (a) sufficient to encourage bidding for the assets; (b) consistent with other procedures previously approved by other bankruptcy courts; and (c) appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. Further, the Bidding Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly sale process.

45.      The decision to sell assets outside the ordinary course of business is based upon the sound business judgment of the Debtors. *See, e.g., See, e.g., Institutional Creditors of Continental Airlines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1225-26 (5th Cir. 1986); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 303, 1311 (5th Cir. 1985); *In re Property Co. of Am. Joint Venture*, 110 B.R. 244, 247 (Bankr. N.D. Tex. 1990);

14

NO:0104253/00008:187893v1

*In re Quality Beverage Co.*, 181 B.R. 887, 895 (Bankr. S.D. Tex. 1995).

46.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule `is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

47.     Courts grant substantial deference to debtors' business judgment when evaluating the procedures to be used in selling assets from the debtors' estate. *See, e.g., Integrated Res.*, 147 B.R. at 656-57 (noting that bidding procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

48.     The paramount goal in any proposed auction of the Debtors' property is to maximize the proceeds received. *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the [Bankruptcy] Code [ is] to enhance the value of the estate at hand"); *Integrated Res.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (*quoting In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

49.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received and therefore

15

NO:0104253/00008:187893v1

are appropriate in the context of bankruptcy transactions. *See, e.g. Integrated Res.*, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Banks. S.D.N.Y. 1991), ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

50. The Debtors have a sound business justification for seeking approval of the Bidding Procedures at this time. Finalizing the timeline for the proposed Sale and approving the Bidding Procedures are in the best interests of the Debtors' estates, their creditors, and their employees. The Debtors have pursued these efforts in compliance with the milestones contained in the Final DIP Order (as amended). Given the Debtors' limited funding and resources and, in light of the fair and open process run by the Debtors and the Investment Banker so far, the Debtors now believe, based upon their sound business judgment, that the best option for maximizing the value of their estates for the benefit of their creditors, employees, and other parties in interest is through a sale accomplished in accordance with the Bidding Procedures.

### C. The Bid Protections Are in the Best Interest of the Debtors' Estates.

51. The Bidding Procedures permit the Debtors to reach an agreement with a Qualified Bidder to become the Stalking Horse Bidder (in consultation with the UCC and the prior consent of the Bond Trustee). Under such circumstances, the Debtors expect that any potential Stalking Horse Bidder may require certain bid protections. The Bidding Procedures authorize the Debtors to negotiate and agree to provide the Break-Up Fee (including an expense reimbursement) in an amount not to exceed in the aggregate 2% of the proposed purchase price under such Qualified Bidder's Qualified APA, all as the Debtors may approve with the consent of the Bond Trustee (the "Break-Up Fee"). The Debtors are seeking to award such Stalking Horse protections without

16

NO:0104253/00008:187893v1

16-80162 - #575  File 01/18/17  Enter 01/18/17 14:59:36  Main Document    Pg 16 of 30
16-80162 - #659-1  File 04/04/17  Enter 04/05/17 15:54:39  Exhibit Debtor 1 part 1  Pg 16 of 25

further notice or order of the Court, with the exception that in the event that a Stalking Horse Bidder is designated, the Debtors shall file notice of that designation within 24 hours of such designation, and the matter will be announced at the Auction.

52.     The Debtors believe that the Break-Up Fee is fair and reasonable and will benefit their estates by promoting a more robust Auction. For bidding incentives to receive an administrative expense priority, the benefit derived from those incentives in favor of a stalking horse is measured against a business judgment standard. *See In re O'Brien Enviro. Energy, Inc.*, 181 F.3d 527, 533 (3d Cir. 1999). The *O'Brien* court identified two instances in which benefit to the estate may be found. First, a benefit exists where the incentive promotes a more competitive bidding process, "such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* Second, courts can also find a benefit where bidding incentives induce a bidder to research the value of the debtor and to submit a bid that serves as the floor bid on which other bidders can rely. *Id.*

53.     The amount of the potential Break-Up Fee is reasonable and appropriate in light of the size and nature of the transaction.  Further, a break-up fee is a typical, and oftentimes a necessary, component of sales outside the ordinary course of business under Bankruptcy Code section 363. *See e.g.*, *In re Kmart*, Case No. 02-B-02474 (SPS) (Bankr. N.D. Ill. May 10, 2002) (authorizing a break-up fee and overbid amounts for potential bidders); *In re Comdisco, Inc.*, Case No. 01-24795 (Bankr. N.D. Ill. Aug. 9, 2002) (approving a break-up fee as, *inter alia*, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate, and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement). The potential award of the Break-Up Fee may provide sufficient incentive for a Qualified Bidder to revise its bid to a level that would warrant such

17

protections and otherwise set a sufficient "floor" at the Auction. Accordingly, the Debtors request authorization to potentially award the Break-Up Fee, pursuant to the terms contained in the Bidding Procedures.

**D.    The Court Should Authorize the Bond Trustee's Right to Credit Bid.**

54.    When property subject to a creditor's lien is sold outside the ordinary course pursuant to Bankruptcy Code § 363(b), the lienholder is entitled to credit bid the full amount of its claim. This fundamental creditor right is preserved in bankruptcy by § 363(k):

> At a sale under subsection (b) of this section of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k). As noted by the United States Supreme Court, the right to credit bid is an important right that protects a secured creditor from having its collateral sold at a below market price (up to the amount of its security interest). *See RadLAX Gateway Hotel LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2070 n.2 (2012). If the "secured party thinks the collateral is worth more than the debtor is selling it for, it may effectively bid its debt and take title to the property." *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R. 668, 680 (D. Mass. 2000) (quoting 7 COLLIER ON BANKRUPTCY ¶ 1129.05[2][b][ii] (Alan N. Resnick & Henry J. Sommer eds., 15th. ed. rev. 1998).

55.    The right to credit bid is a fundamental protection of the secured creditor's constitutional property rights and cannot be impaired without violating the Fifth Amendment's prohibition against taking private property without compensation. *See United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935) (recognizing the right to credit bid among those rights subject to Fifth Amendment

18

NO:0104253/00008:187893v1

protection). As such, a secured creditor's right to credit bid in a bankruptcy sale has been consistently upheld in districts across the country. *See In re SubMicron Sys. Corp.*, 432 F.3d 448, 460 (3d Cir. 2006) ("It is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under 363(k)" (collecting cases)); 3 COLLIER ON BANKRUPTCY ¶ 363.09 (Alan N. Resnick & Henry J. Sommer eds., 16th. ed. 2012) ("Section 363(k) provides that in a sale not in the ordinary course of business, the holder of a lien securing an allowed claim may bid at the sale and, if it is successful, may offset its claim against the purchase price of the property. The right of a lienholder whose lien was not in bona fide dispute to bid at a sale free and clear of liens was generally recognized under prior law, and this right is continued by section 363(k).")

56.    In cases where property subject to a secured creditor's lien is sold in a bankruptcy sale, the sole exception to a creditor's right to credit bid is where the court finds "cause" exists to deprive the secured creditor of its otherwise fundamental right. The type of "cause" generally required to deny a secured creditor its right to credit bid is misconduct on the part of the creditor or where the creditor's lien is in *bona fide* dispute. *See, e.g., In re Daufuskie Island Props., LLC,* 441 B.R. 60, 64 (Bankr. D.S.C. 2010) (holding that creditor was not entitled to credit bid when its mortgage was in dispute); *In re Aloha Airlines, Inc.*, 2009 WL 1371950 (Bankr. D. Haw., May 14, 2009) (disallowing a credit bid because the party making it had entered into an agreement with a third party that had engaged in misconduct with respect to the debtors); *Morgan Stanley Dean Witter Mortgage Capital, Inc. v. Alon USA L.P.*, 2001 WL 1568332, at *3 (N.D. Tex. Dec 4, 2001) (refusing a request to credit bid where the secured creditor's lien was subject to a bona fide dispute that could not be resolved before the sale). The claims and liens of the Bond Trustee are not in dispute. (In fact, the Bond Trustee's claims were allowed, and the validity, priority and

19

16-80162 - #575  File 01/18/17  Enter 01/18/17 14:59:36  Main Document  Pg 19 of 30
16-80162 - #659-1  File 04/04/17  Enter 04/05/17 15:54:39  Exhibit Debtor 1 part 1 Pg 19 of 25

extent of its liens approved, by the Final DIP Order.) Thus, the Bond Trustee's right to credit bid should be allowed.

### E. The Sale Order Should Be Approved

57.    The Debtors submit that ample authority exists for the approval of the proposed sale of the Purchased Assets (including the Facility). Section 363 of the Bankruptcy Code, which authorizes debtors to sell assets other than in the ordinary course of business, provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate...." 11 U.S.C. § 363(b)(1).

58.    Although Bankruptcy Code § 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtors' assets, courts have held that approval of a proposed sale of property pursuant to section 363(b) is appropriate if the transaction represents the debtor's reasonable business judgment. *See, e.g., Cont'l Air Lines*, 780 F.2d at 1226. Courts look to various factors to determine whether to approve a motion under section 363(b) of the Bankruptcy Code, such as: (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed in good faith; and (d) whether adequate and reasonable notice is provided. *See, e.g., In re Condere*, 228 B.R. 615, 626 (Bankr. S.D. Miss. 1998).

59.    First, the Debtors have proposed the Sale after thorough consideration of all viable alternatives and have concluded that the Sale is supported by several sound business reasons. In particular, the Debtors submit that the facts described above, which require a prompt sale of the assets to preserve value for the estates, provide a strong business justification for the Sale. The maximization of asset value for the benefit of creditors reflects a sound business purpose that warrants authorization of the proposed sale.

20

NO:0104253/00008:187893v1

60. Second, the value the Debtors will receive for the Purchased Assets exceeds any value the Debtors could get for the Purchased Assets if the Debtors liquidated this property piecemeal. In light of the robust auction process conducted by the Saltbox and Headwaters, experienced investment bankers, the Debtors expect the proposed Sale to yield the highest or best consideration possible for these assets.

61. Third, as described in more detail below, any sale accomplished in accordance with the Bidding Procedures will be negotiated in the utmost good faith and at arm's length.

62. Fourth, the Debtors will provide notice of the Bidding Procedures as provided in the Bidding Procedures Order, including notice to all creditors, potential bidders and other parties in interest. In addition to the extensive noticing contemplated by this Motion, the Debtors' Investment Banker also marketed the Debtors' assets extensively during the period after its retention and before this Motion was filed. The Debtors submit that such notice and marketing constitutes adequate and reasonable notice to interested parties.

63. Given that the Debtors have established the four principal considerations required to prove that they have a valid business justification for the proposed Sale, the Debtors' decision to sell the Purchased Assets outside the ordinary course of business will enjoy a strong presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Therefore, parties objecting to the Debtors' proposed Sale must make a showing of "bad faith, self-interest or gross negligence." *Id.* at 656; *see also Comm. of Asbestos-Relate Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable

21

NO:0104253/00008:187893v1

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."). Given the strenuous efforts of the Debtors and the Investment Banker to obtain the very best result possible for creditors, no party will be able to make such a showing in this case.

64.    For these reasons, the Debtors submit that approval of the Sale, the Winning Bid APA, and all related transactions is appropriate and warranted under Bankruptcy Code § 363.

**F.    The Proposed Sale Should Be Free and Clear of All Encumbrances**

65.    The Debtors further request that the Court approve the proposed Sale of the Purchased Assets free and clear of all claims, liens, interests and encumbrances, pursuant to Bankruptcy Code § 363(f) and order that any such claims, liens, interests or encumbrances attach to the net sale proceeds of the Purchased Assets, as and to the same extent, validity and priority as existed prior to the Sale. Section 363(f) authorizes a sale of a debtor's assets free and clear of claims, liens, interests and encumbrances if:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

66.    Because Bankruptcy Code § 363(f) is drafted in the disjunctive, satisfaction of any one of its five (5) requirements will suffice to permit the sale of the Debtors' assets "free and clear" of liens and interests. *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re*

22

*Wolverine Radio Co.)*, 930 F.2d 1132, 1 147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met); *In re Dundee Equity Corp.*, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

67.     The Court also may authorize the sale of a debtors' assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) does not apply. *See In re Trans World Airlines. Inc.*, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)"); *see also Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11").

68.     The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Purchased Assets pursuant to a Winning Bid APA. The Debtors intend to submit sufficient evidence at or prior to the Sale Hearing to establish that the provisions of section 363(f) have been satisfied and that the transfer of the Purchased Assets should be free and clear of all such liens, claims and encumbrances.

### G.     Any Winning Bid APA Will Be Negotiated at Arm's Length and in Good Faith.

69.     The terms of any Winning Bid APA will be negotiated at arm's length, without collusion, and in good faith. Accordingly, the Debtors request that the Court determine at the Sale

23

NO:0104253/00008:187893v1

16-80162 - #575  File 01/18/17  Enter 01/18/17 14:59:36  Main Document  Pg 23 of 30
16-80162 - #659-1  File 04/04/17  Enter 04/05/17 15:54:39  Exhibit Debtor 1 part 1 Pg 23 of 25

Hearing that the Winning Bidder negotiated and acted at all times in good faith and, as a result, that it should enjoy the protections of a good-faith purchaser under section 363(m) of the Bankruptcy Code.

70.    Further, the Debtors submit that the Winning Bid APA represents substantial value to the Debtors' estates inasmuch as it provides favorable terms for the disposition of the Purchased Assets for fair and reasonable consideration. *See Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1991) (reasonably equivalent value under the Bankruptcy Code) (1992); *Salisbury v. Texas Commerce Bank-Houston, (In re WCC Holding Corp.)*, 171 B.R. 972, 984 (Bankr. N.D. Tex. 1994) (reasonably equivalent value under Texas law) (citing *Besing v. Hawthorne (In re Besing)*, 981 F.2d 1488, 1495 (5th Cir.) (1993) and *Southmark Corp. v, Riddle (In re Southmark Corp.)*, 138 B.R. 820, 829 (N.D. Tex. 1992)).

71.    The Debtors intend to submit sufficient evidence at or prior to the Sale Hearing to establish that all the parties acted in good faith in negotiating the Winning Bid APA.

**H.    The Debtors Should Be Permitted to Enter into and Execute the Winning Bidder APA.**

72.    Courts routinely approve entry into asset purchase agreements. *See, e.g., In re Enron Corp.*, 2002 WL 32154269, at *4 (Bankr. S.D.N.Y. Apr. 24, 2002). Such agreements are approved if they are an exercise of the debtor's sound business judgment. *See, e.g., In re Decora Indus. Inc.*, 2002 WL 32332377, at *5 (Bankr. D. Del, May 17, 2002); *In re Arlco, Inc.*, 239 B.R. 261, 265 (Bankr. S.D.N.Y. 1999). In this case, the Debtors will introduce sufficient evidence at or prior to the Sale Hearing to establish that the Winning Bid APA was the subject of intense arm's length negotiations between the Debtors and the Winning Bidder. The Debtors will establish that the terms and conditions of the Winning Bid APA are the best that could be obtained under the circumstances, and that entry into the Winning Bid APA is a sound exercise of the Debtors'

24

NO:0104253/00008:187893v1

16-80162 - #575  File 01/18/17  Enter 01/18/17 14:59:36  Main Document   Pg 24 of 30
16-80162 - #659-1  File 04/04/17  Enter 04/05/17 15:54:39  Exhibit Debtor 1 part 1 Pg 24 of 25

business judgment.

I.    **Bankruptcy Code § 365 Authorizes the Assumption and Assignment of the Executory Contracts.**

73.    Bankruptcy Code sections 365(a) and (b) authorize debtors to assume, subject to the Court's approval, executory contracts or unexpired leases of the Debtors. 11 U.S.C. § 365(a) and (b); *In re Jamesway Corp.*, 201 B.R. 73, 76 (Bankr. S.D.N.Y. 1996). Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code section 365(b)(l), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

(b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee

(A)  cures or provides adequate assurance that the trustee will promptly cure, such default;

(B)  compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)  provide adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

74.    The standard applied by a court in determining whether the assumption or rejection of an executory contract or unexpired lease pursuant to section 365(a) should be approved is the "business judgment" test, which requires debtors to determine that the requested assumption or rejection would be beneficial to its estate. *See, e.g., In re Group of Institutional Investors, Inc. v. Chicago, Milwaukee St, Paul and Pac. R.R. Co.*, 318 U.S. 523, 550 (1943) ("the question [of assumption] is one of business judgment"); *Orion Pictures Corp. v. Showtime Networks, Inc. (In*

25

NO:0104253/00008:187893v1